Robert S. LeSage v. Commissioner. Julia LeSage v. Commissioner.
Robert S. LeSage v. Commissioner
Docket Nos. 11239, 11240.
United States Tax Court
1947 Tax Ct. Memo LEXIS 23; 6 T.C.M. (CCH) 1263; T.C.M. (RIA) 47318; December 3, 1947
*23 1. Petitioner and his daughter were not engaged in the taxable years in carrying on a wholesale liquor business in partnership within the meaning of the Federal revenue laws. 2. The sale of petitioner's partnership interest to his partner in an automobile dealership was not completed until November 15, 1943, and petitioner is accordingly taxable on his distributive share of the partnership income for the period from January 1 to November 15. The gain on the sale of his partnership interest is taxable as a long-term capital gain. 3. Dues and subscriptions paid to the Texas Wholesale Liquor Dealers' Association and expenses of annual Christmas parties for employees and customers of the liquor business are deductible as ordinary and necessary business expenses, but an amount paid to the State of Texas in a compromise settlement of anti-trust litigation is not deductible. 4. The amount of deduction for travel and entertainment expenses is determined from the evidence, and for lack of proof deduction is denied for repairs to a boat and for dues paid to social clubs. L. Warren Baker, C.P.A., Mercantile Bldg., Dallas, Tex., Emil Corenbleth, Esq., and M. C. Martin, Esq., for *24 the petitioners. Francis S. Gettle, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: These duly consolidated proceedings involve income and victory tax deficiencies for the calendar year 1943 as follows: Robert S. LeSage
$265,540.94
Julia LeSage
265,540.92 Income for 1942 is also involved in the computations, pursuant to the Current Tax Payment Act of 1943 Certain adjustments are not now contested. The issues remaining for our decision are: 1. Whether a bona fide family partnership existed between Robert S. LeSage and his adult daughter for the operation of a wholesale liquor business. (Several adjustments are dependent on the determination of this issue, and the parties agree to be governed thereby). 2. Whether petitioners are entitled to deduct dues and subscriptions paid in 1942 and 1943 to the Texas Wholesale Liquor Dealers' Association. 3. Whether petitioners are entitled to deduct an amount paid to the State of Texas in 1942, pursuant to a compromise settlement for an alleged violation of state antitrust laws. 4. Whether petitioners are entitled to deduct expenses of annual Christmas parties *25 given by the business in 1942 and 1943. 5. Whether petitioners are entitled to deduct amounts claimed for travel and entertainment expenses in 1942 and 1943. 6. Whether petitioner Robert S. LeSage sold his interest in an automobile dealer partnership on January 1, 1943, or November 15, 1943. 7. Whether petitioners are entitled to deduct expenses incurred in the repair of a boat in 1943. 8. Whether petitioners are entitled to deduct dues paid in 1943 for memberships in a social club. We adopt the stipulated facts, but only so much thereof as is deemed necessary to an understanding of the issues will be set out in our findings. Findings of Fact Issue No. 1 - Partnership Validity Petitioners, husband and wife, are residents of Dallas, Texas. Their income tax returns for the years here involved were filed on a community property basis with the collector of internal revenue for the second district of Texas. All their net income is community income under the laws of Texas. Al Rose Line is their daughter and only child. During the period here pertinent she was adult, married, and had a daughter about seven years old. Robert S. LeSage will sometimes hereinafter be referred *26 to as the petitioner. On August 31, 1942, petitioner was, and for a number of years had been, engaged in numerous businesses, both as a partner and as an individual. These businesses included a Chevrolet dealership, a Ford dealership, and a wholesale liquor business. He had received substantial amounts of income from each of these interests. Petitioner began the operation of the wholesale liquor business in 1934 and conducted it as a sole proprietorship under the name LeSage Company. In 1942 and 1943 the principal place of business was in Dallas, and branches were located at Fort Worth, Houston, Corpus Christi, San Antonio, Waco, Odessa, and Amarillo. The branches were managed by branch managers. The growth of the business from 1934 to August 31, 1942, is reflected in the following accounts: Year
Capital Account
Income
Withdrawals
1934
$ 37,934.36
[19,754.86)
[40,689.22)
1935
57,934.48
(23,287.55)
(43,287.67)
1936
202,167.76
70,152.07
(74,081.21)
1937
329,882.62
123,642.70
( 4,073.16)
1938
435,093.85
157,665.21
52,454.98
1939
570,235.08
144,784.89
9,643.66
1940
766,043.45
261,321.68
65,513.30
1941
1,044,179.00
480,264.97
202,129.42
To 8-31-1942
1,142,691.04
333,684.23
654,602.19
*27 At the beginning petitioner's principal source was Hiram Walker & Sons, and in 1938 he made an additional connection with National Distilleries Products Corporation. In the taxable years about 85 or 90 per cent of the LeSage Company merchandise was received from these two distillers and the rest from numerous small distillers. On September 1, 1942, petitioner had no contracts with these distillers to act as distributor for their products. He could have ceased to do business with them and they with him at will. For a number of years petitioner had piloted his own airplane, and in 1940 and 1941 his health was not good. There was some discussion from time to time between petitioner and the representatives of Hiram Walker and National Distilleries about petitionr's taking in a partner. In July 1942 petitioner talked with his daughter, Al Rose, about making her a partner in his wholesale liquor business, and he also discussed the matter with the distillery representatives. Al Rose had acquired a general knowledge of the liquor business through occasional visits to the branch offices and retail establishments and through family discussions. She also was acquainted with the distillery *28 representatives. On August 31, 1942, after a charge of $654,602.19 to capital account on that date, petitioner's net investment in the liquor business was $723,261.04, that being the difference between assets of $2,702,098.72 and liabilities of $1,978,837.68. In February 1942 the Mercantile National Bank established a line of credit for petitioner for the year in the amount of $315,000. By August he owed the bank $300,000, and sometime during that month the loan was paid off. On September 1, 1942, petitioner and Al Rose entered into a written partnership agreement providing inter alia that petitioner should contribute capital of $723,261.04 (his net investment in the business on August 31, 1942); that Al Rose should contribute capital of $361,630.52; that profits and losses should be shared in the ratio of two-thirds to petitioner and one-third to Al Rose; that petitioner should have charge of the conduct of the business but should from time to time consult with his daughter as to policy; and that no change in the operation should be undertaken nor indebtedness in excess of $100,000 incurred except with the mutual consent of both. From their community property the petitioners *29 made gifts to Al Rose of $8,000 in 1940, of about $44,000 in cash, corporate stocks, and real property in 1941, and of $44,000 cash on August 27, 1942, which consumed the remainder of their specific gift tax exemptions. On August 31, 1942, Al Rose still held this property, the cash being on deposit in her checking account in the Mercantile National Bank. She had no other property at that time. On September 1, 1942, Al Rose, accompanied by the petitioner, his accountant, and his attorney, went to the Mercantile National Bank seeking a loan of $255,000. She furnished the bank a financial statement showing assets in excess of $400,000, including a one-third interest in the LeSage Company. The bank made the requested loan upon Al Rose's personal note and petitioner's personal guaranty. No other security or collateral was obtained by the bank. The net proceeds of the loan were placed to the credit of Al Rose's checking account. On the same day Al Rose wrote her check for $300,000 to the LeSage Company, gave the company her personal note for $36,587.52, and turned over corporate stocks of the value of $25,043 (part of the gift from petitioners in 1941). The total of these is $361,630.52. *30 Partnership books were opened on September 1, 1942, in which capital accounts were set up for petitioner and his daughter. To these accounts the respective amounts of $723,261.04 and $361,630.52 were credited as capital contributions. Al Rose's disabilities of coverture were removed by court order; certificates of doing business under the assumed name LeSage Company were filed with the proper Texas authorities; Federal liquor licenses were reissued in the names of petitioner and Al Rose, doing business as LeSage Company; and a partnership declaration was filed with the Mercantile National Bank. On December 1, 1942, the bank loan of $255,000 was reduced by an amount of $100,000 withdrawn from the business and charged to the capital account of Al Rose. On January 7, 1943, it was similarly reduced by an additional amount of $150,000, likewise withdrawn from the business and charged to her capital account. The balance of $5,000 was paid at a later date. Al Rose's personal note of $36,587.52 to the LeSage Company was paid off with funds borrowed from her uncle, J. H. LeSage and Joe Billups, manager of the Dallas office of the business. The loans from them were subsequently repaid *31 from business profits credited to Al Rose. In November 1942 Al Rose's husband went into the armed services, and from that time until January 1944 she spent the greater part of her time with him at various posts of duty. At intervals she returned to Dallas for a few weeks at a time and when there discussed business matters with the petitioner. She was in and out of the office but had no particular duties and drew no salary. Petitioner drew a salary of $1,200 a month during the period here involved. Petitioner discussed with his daughter the purchase of some stocks of whiskey from a wholesaler in Houston and the purchase of an interest in the whiskey stocks of the Century Distilling Company in Illinois. After her husband went overseas in January 1944, Al Rose returned to Dallas. She then began to work regularly in the office and to draw a salary. In 1942 and 1943 petitioner and his daughter were not engaged in carrying on business in partnership within the meaning of the Federal revenue laws. Issue No. 2 - Dues to Liquor Dealers' Association During 1942 and 1943, LeSage Company was a voluntary member of an organization of wholesale liquor dealers known as Texas Wholesale Liquor *32 Dealers' Association. LeSage Company paid annual dues of $8,051.65 in 1942, and $7,881.20 in 1943. The purposes of the Association, as set forth in Article 2 of its Constitution were as follows: "ARTICLE 2. To establish the relationship between the Wholesale Liquor Dealers and Retail Liquor Permittees of the State at large upon legal and just principles, hoping thereby to promote the public welfare and be conducive to their mutual strength and benefit; to assist and support legislative enactments, both Federal, State and local, looking toward a regulated industry serving the interests of all concerned without prejudice or favor to any; fostering temperance and any movement, action, or education leading thereto; to encourage and assist the officers of the law in enforcing those measures which are designed to protect the public and the wholesale and retail liquor dealers of the State Members." The Association was a general trade organization, created to benefit the wholesale liquor dealers by informing them of matters valuable to the trade. Approximately 75 per cent of the wholesale dealers belonged to the Association. It furnished members with statistical and financial data concerning *33 the liquor business in Texas. It distributed statements of merchandise imports into the state, showing brands, quantities, and importing wholesalers. It kept members advised as to the current status of all retail liquor licenses, thus enabling them to seek the business of licensed concerns. All this information was of considerable benefit to LeSage Company. The above dues were deducted from gross income, but respondent disallowed them on the ground that they did not constitute ordinary and necessary business expenses. Issue No. 3 - Compromise Settlement In September 1940 an action captioned "State of Texas v. R. S. LeSage" was brought for an alleged violation by LeSage Company of state anti-trust laws. The allegations of the state were denied by petitioner's answer. In 1942 he paid $12,500 to the State of Texas as a compromise settlement in the action. The judgment, rendered February 7, 1942, further set forth an agreement that petitioner "is not admitting or confessing the truth and correctness of the allegations contained in plaintiff's original petition." Respondent determined that the amount of the payment was not a proper deduction "from the income reported as partnership *34 income of the LeSage Company." Issue No. 4 - Christmas Party Expenses For ten years LeSage Company had given Christmas parties which were attended by employees, distillery representatives, and customers. Gifts were always presented to those persons present. The parties contributed to employee morale and promoted good feeling between the company and its business contacts. The expenses of the parties held in 1942 and 1943 amounted to $410 and $1,480.70, respectively, and were deducted as business expenses, but respondent disallowed them. Issue No. 5 - Travel and Entertainment Expense In 1942 and 1943 petitioner travelled extensively in the interest of his wholesale liquor business. Particularly in 1943 when liquor supplies were becoming scarce, petitioner spent about 25 per cent of his time in travel to obtain supplies. It was necessary for him to entertain the officials of distilleries and other sources of supply. He made trips to New York, Chicago, Louiville, Cincinnati, and California. He also travelled over the State of Texas and contacted and entertained customers. Occasionally he was accompanied by his wife. In 1943 he made two trips to Mexico in an effort to obtain *35 gin and other liquor supplies, and he made one trip to Canada for the same purpose. Petitioner customarily cashed LeSage Company checks to cover his expenses on his travels. In the tax returns for 1942 and 1943 (petitioner's and the partnership returns of LeSage Company) a total of $65,103.61 was deducted for travel and entertainment expenses. Of that amount, the respondent disallowed $1,556.25 in 1942, and $3,400 in 1943, because not supported by proper records. Of the items in dispute, petitioner did not keep records, such as hotel bills and the like. On his travels he maintained suitable hotel accommodations and spent money in theatres and night clubs in entertaining prospective sellers of liquor supplies. In 1943, however, he did cash checks for $800 and spent that amount on his trips to Mexico and cashed another check for $400 and spent that amount on his trip to Canada. Both of these trips were for the purpose of obtaining liquor supplies for the business. For 1943 petitioner is entitled to an additional deduction of $1,200 over and above that allowed by the respondent. Issue No. 6 - Interest in Automobile Agency In 1936 petitioner became a partner with H. L. McKaig *36 in an automobile business known as McKaig Chevrolet Company at Gladewater, Texas. McKaig was the manager of the business, and its operation was very successful. In 1941 and 1942 profits were equally divided between the two partners. In the early part of 1942, McKaig offered to buy petitioner's interest in the business. Petitioner told McKaig that he would eventually sell his interest, and that they would get together at some future time. Negotiations continued between the parties intermittently during 1942 and 1943. Petitioner was wanting $100,000 for his interest, and McKaig thought that too high. Not until November 15, 1943, did they reach a definite agreement. At that time, petitioner offered to take $80,000 for his interest and McKaig accepted. McKaig paid petitioner the money and petitioner gave him a bill of sale. The parties took into consideration the balance sheet of the business at December 31, 1942, at which time petitioner's capital account was in the amount of $57,405, which represented cost to petitioner of his partnership interest to that date. No partnership return was filed for McKaig Chevrolet Company for 1943, and petitioner did not report in his individual *37 return a distributive share of the income of the company for any part of 1943. McKaig reported the entire business net income in his individual return for 1943 and paid the tax on it. In his individual return petitioner treated the entire amount of his profit, $22,595, as capital gain. In determining the deficiency, respondent held that $12,290.72 was petitioner's distributive share of the earnings of the automobile business from January 1 to November 15, 1943. Of the remainder of the profit, he held that $3,434.76 represented proceeds from the sale of noncapital assets and that only the balance of $6,869.52 was capital gain. Issue No. 7 - Boat Repair Expense Petitioner kept a boat at Corpus Christi, Texas, in 1942 and 1943 and sometimes used it to entertain liquor suppliers and customers. A deduction of $102.92 was claimed in 1943 for repairs made to the vessel, but respondent disallowed it. Issue No. 8 - Variety Club Membership Dues Petitioner maintained two memberships in a private club known as the Variety Club. Both petitioner and his branch manager attended occasionally in order to assure the use therein of liquor distributed by the LeSage Company and to provide entertainment *38 for their customers. Respondent disallowed a deduction of $340 claimed in this connection as a business expense for 1943. Opinion Issue No. 1 Since , and , it is well settled that although a family partnership may be valid for all local law purposes, that fact alone is not determinative of the liability for Federal taxes on the income of the business. For Federal income tax purposes, a wife (or a daughter) may become a partner if she either invests capital originating with her, substantially contributes to the management or control of the business, or otherwise performs vital additional services, or does all these things. If she does none, it is usually an inescapable conclusion that the parties did not really and truly intend to carry on business as partners, and that the partnership is not real within the meaning of the Federal revenue laws. Under those principles the petitioner has made a very earnest effort to lay a foundation for recognition of the partnership between himself and his daughter. He has endeavored to show a business purpose for the formation of the partnership *39 and, with perhaps too studied care, has avoided any mention or admission that any thought of tax advantage was in his mind. He contends that his daughter contributed capital equal to her profit-sharing ratio, and that she also took part in the management and performed vital services. As for the daughter's alleged capital investment, the facts are that within a few days before the execution of the partnership agreement petitioner gave her $44,000 in cash. While petitioner's capital investment at the end of 1941 was more than a million dollars, by August 31, 1942, he had reduced it to about $723,000 by withdrawals in excess of earnings during those eight months. Some time during the month of August he paid off a $300,000 loan to the bank. His line of credit with the bank was $315,000. On September 1 his daughter signed a note at the same bank for $255,000, but petitioner guaranteed the loan. That money, together with the $44,000 cash gift, about $25,000 of stocks which petitioner had given her in 1941, and her personal note for about $36,000, is what she put into the business. In December 1942 and January 1943 the bank loan of $255,000 was almost entirely paid off, all by withdrawals *40 from the business. In the light of these facts, it appears that no capital not already available to the business was made available by taking in petitioner's daughter, and we think there is no real merit or substance in petitioner's claim that she invested capital originating with her. Nor can we conclude on this record that petitioner's daughter took any substantial part in the management or control of the business. During the taxable years involved she spent the greater portion of her time with her husband at various military posts where he was stationed. During the time she was in Dallas, she was "in and out" of the office. We have no doubt that when she was in Dallas petitioner probably discussed business matters with her just as he had always discussed business with his family. The testimony as to her participation in the management is, for the most part, rather general. There was an attempt to show that she objected to petitioner's plan to purchase and market a large portion of the whiskey stock of a distilling concern closed down by war conditions, and this instance is particularly stressed by petitioner as showing an active participation by his daughter. We are not persuaded, *41 however, that in this or any other instance she played a vital role. It also appears that in 1944, after her husband had gone overseas, she began to work at the office full time and drew a salary. Whether her services in that later period were of a kind sufficient to qualify as vital additional services is a question with which we need not concern ourselves. Only the years 1942 and 1943 are involved in this proceeding, and it is clear to us that in those years she neither rendered vital services nor substantially contributed to the management and control of the business within the meaning of the Tower and Lusthaus cases. We have not overlooked petitioner's testimony and that of his close friends, the representatives of Hiram Walker and National Distilleries, in the attempt to show the business need for a partnership. Petitioner testified that because of his health and his flying habits they objected to his continued individual operation. They testified that ordinarily their first preference for a wholesale representative was a corporation and their second preference a partnership; that they were favorable to petitioner's plan to take in his daughter as a partner; and that if anything *42 had happened to petitioner they would probably have recommended to their concerns that his daughter be gaven a chance to continue to represent them. Aside from the fact that this testimony is largely hypothetical and opinion in nature, it fails to convince us that any genuine business purpose was or could be accomplished by taking petitioner's daughter into the business. We hold that the respondent did not err in refusing to recognize the partnership and taxing all the LeSage Company income to the petitioners. Issue No. 2 Dues of $8,051.65 in 1942 and $7,881.20 in 1943 were paid by LeSage Company to the Texas Wholesale Liquor Dealers' Association, an organization formed for the general welfare of local wholesale liquor dealers. From the evidence submitted, we are of the opinion that the business did derive benefit from the Association and that such dues were an ordinary and necessary business expense. ; ; ; . Respondent erred in disallowing the deduction. Issue No. *43 3 Petitioners claimed a deduction of $12,500 in 1942, an amount paid to the State of Texas as a compromise settlement for an alleged violation of the state anti-trust laws. Although guilt of the charge was at all times denied, we hold that respondent properly disallowed the deduction. See , certiorari denied, , and Universal Atlas Cement Co., 9 T.C. (No. 128), November 25, 1947. Issue No. 4 We hold that the amounts expended in 1942 and 1943 to cover the costs of the LeSage Company Christmas parties are deductible as ordinary and necessary business expenses. These parties had been given each year for the previous 10 years and had proved helpful and beneficial in promoting the business of the LeSage Company. Respondent's action with respect to this issue was in error. Issue No. 5 Admittedly, petitioner did not keep records of the items in dispute for travel and entertainment expenses in 1942 and 1943. Other than his testimony that he spent all the disallowed amounts in travel and entertainment for business purposes, he has not been able to identify specific items with the *44 exception of $800 spent on the trips to Mexico and $400 on the trip to Canada. As to these amounts totaling $1,200 for 1943, we think the evidence is sufficient to support the conclusion that they were actually spent for legitimate business purposes. But we feel unable, on this record, to make any additional allowance for 1942. Issue No. 6 Petitioner takes the position that his interest in the McKaig Chevrolet Company was sold on January 1, 1943, and that no part of the operating profit of that business during 1943 is taxable to him. With that contention we are unable to agree. The evidence convinces us that not until November 15, 1943, did the parties reach a definite agreement on all the material terms of the sale. Until that time, in our view, petitioner's proposition amounted to nothing more than an offer to sell his partnership interest. On that date, petitioner finally made an offer to take $80,000 for his interest, McKaig accepted, the money was paid, and petitioner gave McKaig a bill of sale. Petitioner took no active part in the operation of the business either before or after January 1, 1943, and the status of the business remained the same as it had been over a period *45 of years. Until November 15, 1943, petitioner could have asserted management and control over the firm. We accordingly hold that the respondent did not err in taxing to petitioner, as ordinary income, petitioner's distributive share of the business earnings up to November 15, 1943. He did err, however, in allocating the gain on the sale between noncapital and capital assets. What petitioner sold was his partnership interest as an entirety. The gain thereon was a capital gain. ; . Issues Nos. 7 and 8 Petitioners claim additional deductions for repairs to a boat, and membership dues of a social club. Respondent's disallowance of the deductions is sustained for want of proof of such expenditures. Decisions will be entered under Rule 50.